## Danville Bridge Company *versus* Pomroy & Colony.

1. Individuals contracted to erect a bridge over the River Susquehanna, at their own cost, to be paid for by the bridge company at certain specified rates, the work to be subject during its progress, to the supervision and direction of the engineer of the company, the bridge to be framed according to the Burr plan, similar in all respects to the bridge at Northumberland, except as provided for; twelve and a half per cent. on the estimates of the engineer to be retained by the company until the contract was performed. Before the bridge was completed, the company forcibly took possession of it, whilst the work was progressing, and opened it for use, and received tolls. Suit was afterwards brought for a balance of the consideration: *Held,* that the contractors alleging performance of their contract, having *substantially* complied with the same, and not having been guilty of fraud, or gross negligence, or obstinate and wilful refusal to fulfil their whole engagement, or of a voluntary and causeless abandonment of the work, are entitled to recover the balance due them, subject to a deduction for damages for imperfections and deficiencies in the work.

2. The engineer of the company appointed to supervise and direct the work, having notice of an alteration in the structure, supposed by the builders to be an improvement, notice to him was notice to his principals.

3. The retention of twelve and a half per cent. of the estimates until the completion of the work, is not in the nature of stipulated damages, or as a precedent condition requiring performance of the contract in every particular, by the contractors, before suit. It was a mere retention to answer any damages suffered.

ERROR to the Common Pleas of *Columbia county.*

This was an action of assumpsit, brought by Pomroy & Colony, against the President, Managers, and Company of Danville Bridge. Plaintiffs claimed about $1650—suit brought 10th August, 1848. Sept. 1, 1849, verdict for plaintiffs, for $1606.24.

[Danville Bridge Company *v.* Pomroy & Colony.]

Statement on part of *plaintiffs in error.*—On the 11th May, 1846, plaintiffs in error entered into an article of agreement with David N. Kownover and Chester B. Evans, for the latter to build them a bridge across the river at Danville, where one had stood, which was destroyed by a freshet in the spring of 1846. The size of the piers and abutments and manner of building them is most particularly set forth in the agreement. But the manner of building the superstructure is not particularly described, but it was to be " framed upon the ' Burr plan,' similar in all respects to the State bridge across the mouth of the west branch at the town of Northumberland, except," &c. The agreement stipulates " the whole of the work shall be subject during its progress to the supervision and direction of the engineer in the employ of the company, who shall from time to time give such directions as to the form, dimensions, and manner of constructing said work as may be necessary to carry out the plan contemplated in these articles." It also stipulates that " the bridge shall be finished by the 1*st day of January*, 1847, and if not finished by that day, then that the said Kownover and Evans shall pay, as damages, an amount equal to the tolls received during the corresponding days and time of the year previous to the destruction of the late bridge, until the said bridge shall be completed;" and " that 12½ per cent. on the estimates of the engineer shall be retained by the said company until this contract is *fully performed and fulfilled.*"

It was also agreed upon that at the end of each month, the work done and the materials procured, shall be estimated by the engineer of the company, and the said estimate shall be paid on the tenth day of the next month, in cash, until $10,000 shall have been paid. Thereafter, the said contractors shall receive for said payments, the bonds of the said company, until $10,000 more shall have been paid. The said bonds shall be made payable to bearer, and of such amounts as the said contractors may require. The times of payment were mentioned. For the balance that may be due after the payment of $20,000, the company were to issue their bonds, &c.

It appears that on the 26th June, 1846, Kownover & Evans entered into an agreement with Pomroy & Colony, for the latter to build the superstructure of the bridge—the former to furnish the materials. The Bridge Company WERE NOT IN ANY MANNER PARTIES TO THIS AGREEMENT, and it was alleged on the part of plaintiffs in error, that they had not any knowledge of its contents, nor of the fact of any contract between them. Evans died in spring of 1847, and on 17th June, 1847, Kownover gave Pomroy & Colony an order upon the bridge company, of that date, as follows:—

. " Messrs. Directors and Managers of the Danville Bridge Company :—Sirs :. Pay to Pomroy & Colony four thousand seven

[Danville Bridge Company *v.* Pomroy & Colony.]

-hundred and sixty-six dollars and sixty-one cents, out of the funds called for by my contract for building said Danville Bridge, to be paid *monthly*, agreeable to the monthly estimates upon the work of the superstructure of said bridge, and subject to a discount of twelve and a half per cent. until the work of said superstructure shall be completed agreeable to the *plan and specification* for said bridge—*and then the amount due, together with* the discount, is to *be paid*. If said managers will accept the above, they shall for ever be discharged from paying the above to me. The above is to be in equal proportions of those bonds which fall due first and those that last fall due.  D. N. KOWNOVER."

"June 17, 1847."

10th July, 1847, the order of D. N. Kownover, in favor of Pomroy & Colony, of 17th June, 1847, was accepted. The company paid Pomroy & Colony, upon this order, $3200 in various payments *in full of* the monthly estimates, less 12½ per cent., until Nov. 1847, when the engineer refused to grant an estimate upon the work of the preceding month, on account of its defective character.

The bridge was not crossable for teams until *5th November*, 1847, 10 months and 5 days after the time fixed by the agreement for its *completion*, and on that day the builders opened it. It continued open one week, and Colony shut it up. It was alleged that at that time the embankment was not done.

*On the part of the defendants in error*, it was stated that on 10th of July, 1847, after the erection of at least two spans of the bridge, and with a knowledge of the then condition of the bridge, and that the superstructure was being erected by Pomroy & Colony, they *accepted the order*. In December, 1847, while Pomroy and Colony were yet working at the bridge, the Bridge Company employed hands and took forcible possession of the bridge, without the consent of Kownover, and against the consent of Pomroy & Colony, and have had the possession and use of the bridge ever since. Pomroy & Colony went on with the work, and finished the bridge, and on the 10th of August, 1848, the company having previously paid them $3200, in cash and bonds, they demanded the balance, $1566.61, in the bonds of the company, which Hibler, the president, refused to give to them. They then brought suit.

The Bridge Company contended that Pomroy & Colony were not entitled to recover any thing in this action, and alleged as reasons—

1st. That the superstructure was unskilfully constructed and framed, and the work badly done.

2d. That skewback braces, tins at the joints of the queen-posts and truss-braces, and cast-iron pedestals at the entrances, were omitted, and that the floors were not fastened down.

3d. That any deficiency in the work, or any of these omissions,

[Danville Bridge Company *v.* Pomroy & Colony.]

is a breach of a *condition precedent* in the order, and is not the subject of compensation, but is a positive bar to recovery, without regard to their value.

The plaintiffs below asserted that they had completed the work of the superstructure according to the plan and specification of the said bridge, that the evidence was voluminous, and that there was none which attached negligence or wilful misconduct to them.

Notice of special matter was given as follows :—

You are hereby notified, that upon the trial of this cause, the defendants will prove that the superstructure of the bridge referred to in your declaration, and in the order recited therein, never was built and completed, nor the work of the same done agreeably to the plan and specifications referred to in the contract mentioned in the said order, made between the defendants and David N. Kownover and Chester B. Evans, for building said bridge—also, that some most material portions of the work required by said plan and specifications and contract were entirely omitted—such as skewback braces, cast-iron pedestals at the entrances, sheet-iron or tin covers for the joints at the junction of the king-posts and truss-braces. That some other portions of the said work are only partially and badly done—such as the painting and flooring. That the superstructure of the whole bridge is unskilfully constructed and framed, and not according to the said plan and specification, and its workmanship defectively and badly executed—and that some of the materials of which the said superstructure of the bridge is built are defective, deficient, and unsuitable ; and that in consequence of these omissions, defects, deficiencies, unskilfulness, bad work and bad materials, the defendants have sustained damage to a large amount.

The case was tried before J. B. ANTHONY, Pres't Judge. On the trial, various points were proposed on the part of the defendants. To the first of them, the court charged :—The terms and conditions of the order constituted a part of it, and to entitle the plaintiffs to recover thereon, it is necessary to show that the superstructure of the bridge was completed according to the terms of the agreement referred to in the order, unless defendants accepted the bridge, received the tolls, and reduced it to use in the manner it was finished by plaintiffs. If the jury believe that defendants accepted the bridge, received the tolls, and reduced it into use after its erection, they would be entitled only to such deduction from plaintiffs' demand as is sufficient to compensate them for defective execution of the contract.

To another, it was charged :—That the general rule is, that in an entire contract like the present, as set forth in the declaration, it is incumbent on plaintiffs to show performance of all that was stipulated on their part to be done ; and on failure so to do, they

[Danville Bridge Company *v.* Pomroy & Colony.]

are not entitled to recover any thing.    But when a party acts fairly and honestly, and performs the contract *substantially* on his part, though he fails in some particulars by a deviation from the contract in some unimportant matters, the other party ought to *pay a fair and just compensation*, after receiving credit for the loss or damage he sustains from such deviation.    In the present case, as the engineer employed by the bridge company superintended the work during the erection of the bridge, and as the defendants took *possession of the bridge against the contractors in November*, 1847, appointed guards to protect it, and a toll-keeper to receive tolls, and the said bridge has continued under their control and direction from that time till the commencement of this suit—the court, therefore, refuse to give the instructions prayed for on the 4th, 5th, and 6th points of defendants, and are of opinion that these facts, if believed by the jury *would amount to a waiver* by the Bridge Company of a literal and precise compliance by plaintiffs with the original written contract; but that the Bridge Company would be entitled to a deduction for such defects in the work and such omissions as have been made by the plaintiffs from the amount of the order on which suit is brought.

And in the general charge, the court observed, *inter alia:*—

On 10th July, 1847, the order was accepted by the Bridge Company, according to its terms and conditions.

The plaintiffs below, to support their claim, gave in evidence articles of agreement between the Managers of the Danville Bridge Company of the one part, and Chester B. Evans and David N. Kownover of the other part, dated 11th May, 1846, for the erection and construction of a bridge over the North Branch of the Susquehanna, at Danville.    This agreement the jury will have out with them, and you will carefully examine all its stipulations and provisions, so that you may apply the other evidence in a proper manner.    On 26th June, 1846, plaintiffs entered into an agreement with the original contractors for building the bridge, to complete the superstructure.    The Danville Bridge Company *was not a party to this last agreement;* and if the company had not accepted the order of Kownover (who survived Evans) in favor of plaintiffs, the present suit could not have been maintained at all, for, in that case, the plaintiffs must have looked to Kownover for remuneration, and Kownover to the Danville Bridge Company, with whom he and his deceased partner, Evans, made the contract.    The plaintiffs further gave in evidence that they had demanded the last estimate of the treasurer of the Bridge Company in November 1847 ; also that, on the 10th of August, 1848, Mr. Colony went to the president of the Bridge Company and demanded the balance of the amount of the order, and was refused payment.    They also *proved that the bridge was completed in July*, 1848, and that, at and before the time of bringing suit, it was and continued to be in the posses-

sion of the Bridge Company; that the company took possession of it in November, 1847, and that it was *then* passable. The plaintiffs then rested their cause; and the counsel for defendants opened their defence.

The principal grounds of defence that have been urged by defendants, are set out in *their notice of special matter*.

The bridge company had an engineer in their employ to superintend the work, who was almost daily, and sometimes hourly engaged in the performance of his duties. It was incumbent on him to see that the work was done in a substantial and workmanlike manner, and that the timber and materials were of the proper kind and quality. So far as he approved of the work, as it progressed, it would be strong and powerful evidence in favor of the *contractors ;*. but if the jury believe that the engineer was not satisfied with the *plaintiffs' manner of performing the work* and completing the superstructure, then you have a right to take those facts into consideration in *deciding to what extent, if any, the plaintiffs failed to fulfil their part of the contract in a substantial and workmanlike manner,* [and in case you believe that the work has not been thus performed] *you ought to deduct from the plaintiffs' claim a sum sufficient to compensate the Bridge Company for the imperfections and deficiencies in the work.*

The plan of building bridges invented or improved by Theodore Burr has been uniformly considered by scientific men and skilful architects as one of immense utility and of great importance to our country; and one of the principal improvements to which he laid claim was the combination of the arch with the truss frame, so as to give strength and durability to the work. The bridge at Northumberland *was the model* (with particular exceptions) *of the framework* of the Danville bridge, and the complaint made by defendants is, that there is a material difference between the manner of constructing the two bridges. The *contractors* substituted the post at the ends of the arches for the skewback braces, and we have a large mass of testimony on this point. From the evidence given, it would appear to the court that the skewback brace has a decided advantage over the post that has been substituted in its place, though the jury have heard all the testimony on this point, and with you we leave *this fact* to be decided. The engineer has given his testimony in relation to this matter, and others have also testified about it. He positively denies that he assented to dispensing with the skewback braces, though some other witnesses contradict him. * * * *

We have also a mass of testimony with regard to the sky braces and as to their effect in placing the bridge in a vertical position, when it inclined or swagged laterally. Mechanics differ respecting their efficiency in keying up the bridge when swaying to one

side ; and the jury will take this into consideration, as well as all other facts that have been spoken of, which tend to lead to a proper conclusion.

Without again referring to the items particularly, the jury will ascertain the amount of damage which the Bridge Company has sustained by the non-performance of the work by the plaintiffs, according to the agreement, deducting from the plaintiffs' claim (even to the full amount, if necessary) any *deficiencies* and *imperfections* in the superstructure, and any damages defendants have sustained from the *neglect of the plaintiffs* to put in the iron pedestals at the entrances of the bridge, the tins at the lower end of the truss braces, the fastening of the floor to the sleepers, and all other neglects or omissions on the *part of the plaintiffs* substantially to comply with the *provisions and stipulations* of the *contract.* It was proved that the joints at the junction of king-posts and braces were rotten at Northumberland, notwithstanding the tins, which were thought by some of the witnesses to be injurious ; and if so, omitting to put them on would be no injury to defendants so as to form a defence to the action.

Verdict for plaintiffs for $1606.24.

Error was assigned to answers of the court, and to the charge.

The case was argued by *Pleasants,* for the company, and by *Comly,* with whom was *Bancroft,* for defendants in error.

The opinion of the court was delivered by

BELL, J.—By their agreement of the 26th of June, 1846, the plaintiffs below assumed the liability and undertook the engagements of Kownover and Evans, in respect of the superstructure of the bridge to be rebuilt.  The order drawn by the latter in favor of the former, and the acceptance by the company, so refers to the original contract as to show the parties contemplated it as the basis of the transaction, and as the standard by which the relative rights and remedies of the now plaintiffs and defendants were to be measured and determined.  It is true, the order and acceptance furnish the immediate foundation of the action, but its sufficiency, as affording means of redress, is influenced and limited by the articles of the 11th of May, to which all the parties unequivocally point as the governing instrument.  The cause is, therefore, to be determined precisely as though Pomroy and Colony were the original contractors for building the superstructure of the bridge, upon the terms and under the conditions stipulated between Kownover and Evans and the company.  Thus treated, the case may be approached disembarrassed of some of the perplexities a different view tends to engraft upon it.

O

[Danville Bridge Company *v.* Pomroy & Colony.]

By the terms of the first contract, the bridge was to have been finished on the 1st of January, 1847, under penalty of a stipulated forfeiture. But all the evidence in the cause shows that this stipulation was waived. Indeed, it was not at all insisted on, as furnishing any ground of defence. Had it been, the terms and time of acceptance of the order by the defendant would have afforded the plaintiffs a triumphant answer : Preston *v.* Finney, 2 *W. & Ser.* 55. In pursuance of their agreement with Kownover and Evans, the plaintiffs, with their workmen, commenced to build the superstructure in the year 1846. It progressed, under the immediate supervision and direction of the defendant's engineer, until November, 1847, when it was practicable for the passage of wagons and other vehicles. Early in that month, the plaintiffs opened it to travellers and others, intending to take the tolls for their own benefit ; but their right to do so was disputed by the defendant, and a quarrel ensuing, the bridge was again closed by the contractors. It so continued until the first of December, when, it would seem, the company took forcible possession of the structure ; or, at least, the possession was assumed against the will and in spite of the plaintiffs, who were then carrying on the work towards its completion. On the same day, the defendants threw the bridge open for the transit of animals and carriages, taking toll in the usual way, and placed persons, as guards, to prevent the contractors from again assuming the command of it. The possession and collection of tolls has been continued ever since, the plaintiffs, in the mean time, continuing to labor on the bridge until August, 1848, when, pronouncing it to be completed, they demanded to be paid to them . $1566.61, the balance due of the sum called for by the order of June, 1847, as they averred. Payment was refused, because of certain defects and omissions in the work, which, it is insisted, constitute such a violation of the original contract as, in law, bars the action, and wholly defeats the plaintiffs' right to recover any part of the sum demanded. The Court of Common Pleas denied this, and instructed the jury that the defects and omissions complained of, if proved, did not affect the whole consideration of the contract, and, being capable of compensation in damages, were not, necessarily, an answer to the whole of the plaintiffs' demand. The defendant's position is drawn from the general rule, that an entire contract must be performed in all its parts by him who claims a counter performance from the other contracting parties, and if there be a failure in any particular, no recovery can be had, however meritorious may be the claim preferred for services actually performed in furtherance of the engagement. At one time, this rule was rigidly adhered to, though the consequence was to bestow upon one the advantages derived from the labor, time, and money of another ; because, it was supposed, an insuperable technical difficulty forbade a division of the subject of the contract. Mutual

[Danville Bridge Company *v.* Pomroy & Colony.]

covenants, like those which exist here, were treated as necessarily entire; and as performance on one side was regarded as a condition precedent to a demand for performance on the other, nothing short of a perfect discharge of every part of the undertaking was accepted as a sufficient fulfilment of the condition. This was peculiarly so when the contract was for the execution of a task, involving skill and labor on one side, to be compensated by payment in money, or other valuable thing, on the other. And it is still the general rule which governs the remedy upon entire contracts, as is shown by Shaw *v.* The Turnpike Company, 2 *Pa. Rep.* 454; Alexander *v.* Hoffman, 5 *W. & Ser.* 382, and other cases.

But the injustice inflicted in practice, by a liberal application of it in all cases, long since introduced an exception to, or rather modification of a principle, which, however perfect in theory, was found to work harshly in a large variety of instances. That modification was, perhaps, first recognised in Boone *v.* Eyre, 1 *H. Bl.* 273, note a: and is thus stated in Ligget *v.* Smith, 3 *Watts* 331, where it was approved and applied. A mutual or dependent covenant, which goes but to a part of the condition on both sides, and whose breach may be compensated in damages, is to be treated exactly as if it were separate and independent. Its non-performance will not, necessarily, bar the entire right of the plaintiff. So too, a covenant which is in form entire, but in truth embraces a variety of acts, more or less essential to the whole performance, may be so discharged as to sustain an averment of performance, though a literal compliance cannot be alleged: Wilhelm *v.* Caul, 2 *W. & Ser.* 26; Preston *v.* Finney, *id.* 53, and Chambers *v.* Jaynes, 4 *Barr* 39, are examples of this. Each of them proceeds upon the ground that, where a party, acting honestly, and intending to fulfil his contract, performs it substantially, but fails in some comparatively unimportant particulars, the other party will not be permitted to enjoy the fruits of such imperfect performance, without paying a fair compensation according to the contract, receiving a credit for any loss or inconvenience suffered. And, perhaps, it may be asserted, that where a thing is so far perfected as to answer the intended purpose, and it is taken possession of and turned to that purpose by the party for whom it is constructed, no mere imperfection or omission, which does not virtually affect its usefulness, can be interposed to prevent a recovery, subject to a deduction for damages, consequent upon the imperfection complained of. Of course, the indulgence is not to be so stretched as to cover fraud, gross negligence, or obstinate and wilful refusal to fulfil the whole engagement, or even a voluntary and causeless abandonment of it. This distinction is pointed out by Mr. Justice SERGEANT, in Preston *v.* Finney, from whence he draws the conclusion, that "in those cases where the law allows the party to recover on a *quantum meruit* or *quantum valebat,*

[Danville Bridge Company *v.* Pomroy & Colony.]

when there is a special contract, this is the principle which applies." When a large proportion of the work remains undone, so as to disappoint the expectations and motives which led to the contract, or, in the absence of dispute, the undertaker perversely refuses to finish the work, having it in his power to do so, in refusal of the request of the other party, this will furnish a sufficient answer to an action on the contract. Both of these features characterized Shaw *v.* The Turnpike Company, 3 *Pa. Rep.* 53. The latter is not mentioned in the report of the case, but it is said, in Preston *v.* Finney, to have been so. At the interview of August 1848, between the plaintiffs and the Managers of the Bridge Company, the demand of payment made by the former was refused by Mr. Hibler, the president, in the name of the board, because of the omission of the skewback braces, iron pedestals at the ends of the bridge, tin at the lower ends of the truss braces, and the fastening of the floor. The objections are repeated by the notice of special matter, with the addition, that the superstructure was not completed according to the plan and specifications; that it was unskilfully constructed and framed, and that its materials and workmanship are bad and defective. These, then, comprise all the grounds upon which it is claimed the plaintiffs should be barred of their action. The allegation that the superstructure is not completed according to the plan is urged no further, in proof and argument, than the omissions I have already particularly enumerated. Of the alleged defective material and unskilful workmanship, it will suffice to observe, that it is conceded on all hands, this can only be legitimately considered as furnishing ground for an estimate of damages to be deducted from the price of the bridge. It was so submitted to the jury, and of this portion of the instruction given them, no complaint is made, as I understand it. We may, therefore, confine ourselves to the alleged omissions in the inquiry, whether these, under the rules I have brought to notice, are to be considered as a full answer to the action. By the original contract, the superstructure of the bridge was to be framed according to the "Burr plan," " similar in all respects to the State bridge across the mouth of the West Branch of the Susquehanna at Northumberland, except so far as is hereinafter provided for." The last-mentioned structure is provided with skewback braces; cast-iron pedestals, to protect the posts at the entrances of the bridge from injury by wagon-wheels; tin coverings at the junction of the posts and truss braces, and the floor is fastened down with wooden pins. In these enumerated particulars, the Danville bridge is deficient. But the plaintiffs answer that the pedestals, tin, and fastenings of the floor do not enter into the framing of the superstructure, according to Burr's plan. That, being wholly independent of it, they were not bound to furnish them, more especially as their work was done under the eye of an engineer, selected by the company to oversee the progress of con-

struction, who gave no instructions on these points. There is much plausibility in this argument, and I confess, with my very limited knowledge of the subject, I felt, during the discussion, very much inclined to adopt it. But the court below put it upon, perhaps, the safer ground, that, treating the particulars as part of the plan, they were comparatively of such trifling import as to be the subject of compensation in damages. In this we agree with the learned judge who tried the cause. They do not enter, vitally, into the structure. It may be, and has been, profitably used without them; and, at all events, the application of a very small sum of money would supply them with as much effect as though they had been placed there by the contractors. Of their obligation so to place them, there is at least some doubt, and this, in itself, is sufficient to deprive the objection of any fatal effect which, by possibility, might be attributed to it.

The principal subject of debate, however, is the omission of the skewback braces. There is some question, made by the evidence, whether these enter into "Burr's plan" as a necessary part of it. They are, however, used in the Northumberland bridge, and it seems a highly useful, and, perhaps, important portion of that peculiar form of bridge. Being, too, a portion of the framing, I think we may take it as indisputable that the parties to the original contract contemplated the insertion of these braces as a part of the projected structure; and it was, consequently, the duty of the plaintiffs to give them a place in the bridge built by them. How far their entire omission, independently of other circumstances, might furnish a complete defence to this action, it is not now necessary to determine; though, I am strongly inclined to believe, they fall within the exception I have stated, as being, comparatively, of little cost, by incurring which they might, even now, be added to the superstructure. But, in this connection, it is to be recollected an agent, called an engineer, was appointed by the managers, to whose supervision and direction the whole of the work was to be subject during its progress, and who, in the language of the contract, "shall, from time to time, give such directions, as to form, dimensions, and manner of constructing said work, as may be necessary to carry out the plan contemplated in these articles." These are large powers. In the exercise of them, the engineer was in almost constant attendance, directing and correcting, under the eyes and with the knowledge of the defendants. It is in full proof, too, that Colony proposed to the engineer an alteration, supposed by the former to be an improvement in the structure, by connecting the entrance posts with the skewbacks, instead of inserting the skewback brace. This seems to have been approved of by the engineer, and the alteration was made, with his full knowledge. If necessary, it would be well worth consideration, whether assenting to such a change was not within the scope of his powers, particu-

[Danville Bridge Company *v.* Pomroy & Colony.]

larly as it was shown the skewback brace is not always found in the Burr bridges. But, waiving this, it is beyond question he, as the servant of the company, specially deputed to watch the progress of the work, knew of the alteration not long after the plaintiffs commenced the erection of the truss-work. Now, notice to him was notice to his principals. Nay, it is to be presumed that he communicated the fact to them, with his approval of it. One of the then managers, indeed, testified he was told of the alteration by the engineer, and of his approval, because, as he said, he thought it better than the other plan. After this, the bridge progressed to completion, through a series of months; the managers took possession and assumed the control of it in December, 1847; and it was not until August, 1848, when the contractors, having, as they supposed, finished their undertaking, asked for the balance due to them, are told of the objections entertained by the defendants. Perhaps, under these peculiar circumstances, it would not be too much to say, the assent of the defendants to the omission of the skewback braces ought to be presumed. But, at all events, it takes away every pretence for saying the plaintiffs were guilty, either of wilful obstinacy or gross negligence in the particular under consideration. It cannot be overlooked that the builders naturally looked to the engineer, as the authorized medium of communication between them and the company; and that the latter, by its managers, put full trust in the agent. If in this way the former were misled, or even fell into an innocent mistake, induced by the conduct of the managers or their agent, the latter cannot, after relieving the mechanics of the bridge, and entering upon the enjoyment of their labor, set up the misconception as a complete defence. To permit this would be to countenance iniquity, a consequence avoided by modern tribunals in their administration of the law of contract. Though Pomroy and Colony did refuse, in August, 1848, to add the omissions pointed out by the managers, it was not, under the facts in proof, such a refusal as will operate to strip the plaintiffs of all redress. I feel it almost unnecessary to say that this conclusion is not to be affected by the stipulation for retaining $12\frac{1}{2}$ per cent. of the estimates until the completion of the work. The counsel, who argued for the plaintiff in error, seemed to think there is in this something of the nature of stipulated damages, founded in a precedent condition, which can only be discharged by a literal compliance with every minutia of the original contract. But it is nothing more than a retention of a portion of the earnings of the plaintiffs until the completion of the work, to answer any damages suffered—a thing very usual in contracts of this nature. Upon the whole case, as it is presented to us, we are satisfied the court below laid it fairly before the jury, under instructions justified by the law of contracts, as it is now understood. The jury have passed upon the respective rights of the

[Danville Bridge Company *v.* Pomroy & Colony.]

parties, as thus explained to them, and from the small sum deducted from the plaintiffs' demand, it is clear they entertained the opinion the defendant had been but slightly damnified by the sins of commission and omission imputed to the plaintiffs.

The bills of exceptions to evidence, taken on the trial, have not been argued. They were, very properly, abandoned as untenable. There is nothing in them which would bear examination.

Judgment affirmed.